# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

The State of Georgia,

v.                                    Case No. 1:23-cr-287-MLB

Sung H Kim,

                Defendant.

_____/

## **OPINION & ORDER**

In January 2019, a team from the FBI Atlanta Violent Crime Task Force—including Defendant Sung Kim, a federally deputized Atlanta police officer—went to an apartment to execute an FBI operation plan to arrest Jimmy Atchison on a warrant for armed robbery. (Dkts. 52-7; 60 at 15–26, 59–60, 98.) The team knocked on the apartment door, announced who they were, and ordered Mr. Atchison to come out. (Dkt. 60 at 63.) Mr. Atchison did not respond. (Dkt. 60 at 63.) The team then breached the door and entered the apartment. (Dkt. 60 at 63.) As they did so, Mr. Atchison jumped out of a window—in violation of the officers' commands—and ran towards another building in the apartment

complex.  (Dkt. 60 at 26–27, 67–71.)  The officers chased Mr. Atchison but could not catch him.  (Dkts. 60 at 29, 69; 61 at 16.)

When the officers converged on the second building, Mr. Atchison ran towards a third building in the complex.  (Dkt. 60. at 30–31, 70–71.) The officers again chased Mr. Atchison and ordered him to stop, but he did not comply.  (Dkt. 60 at 31, 71–72, 152.)  As the officers looked for Mr. Atchison at the third building, Tamika Pless (a resident in the building) told Kelly Lambert (a Task Force officer) that Mr. Atchison ran into her apartment, she thought he was in the back right bedroom, she wanted the officers to remove him, and the officers had her permission to go inside.  (Dkt. 60 at 33–34, 72, 75–76, 154; *see* Dkt. 61 at 19.) Kelly Lambert relayed this information to the rest of the team.  (Dkt. 60 at 33–34, 76, 154–155.)  The team then made a "collective decision" to enter the apartment.  (Dkt. 52-10 at 10.)  No one expressed any hesitation about doing so.  (Dkts. 60 at 76, 205; 61 at 59.)

At least six officers lined up to enter the apartment: four members of the FBI Task Force (Defendant, Mark Cooper, Matt Winn, and Paul Costa), a member of a U.S. Marshals task force (Tim Turner), and a City of Atlanta police officer (Mason Mercure).  (Dkts. 52-10 at 3; 60 at 36, 78,

155.)  Either Matt Winn or Tim Turner was first in line.  (Dkts. 52-10 at 6–7; 60 at 79, 156.)  Another officer—likely Mason Mercure—knocked on the apartment door, yelled "this is the police" (or words to that effect), and ordered Mr. Atchison to come out.  (Dkts. 52-10 at 7; 60 at 81, 159; 61 at 59–61.)  No one responded.  (Dkt. 60 at 81.)  After knocking and announcing several more times without response, the officers opened the door (which was unlocked) and entered the apartment.  (Dkts. 60 at 76, 81, 84, 107, 160; 61 at 59–61.)

The officers cleared several rooms—and continued to call out for Mr. Atchison without response—before Defendant found him hiding under a pile of clothes in a closet in the back left bedroom of the apartment.  (Dkts. 53-1; 53-2; 60 at 81–89, 158, 164, 206–211; 61 at 49–50, 68; 70 at 30.)  Mr. Atchison was sitting on the closet floor facing Defendant and, except for a portion of his face/chest, was entirely concealed by the clothes.  (Dkts. 60 at 87–89, 166–169, 179, 211; 70 at 30.)  Defendant pointed his gun at Mr. Atchison and yelled "show us your hands," "don't move," or something along those lines.  (Dkts. 60 at 90, 92, 169, 199–200, 211; 70 at 31, 34–35.)  Mr. Atchison said nothing in response.  (Dkt. 60 at 90.)  Instead, he suddenly and rapidly moved one

of his hands—or potentially both of his hands "clamped together"—from underneath the clothes towards Defendant's face/chest area. (Dkts. 60 at 91–92, 169–171, 211–215; 70 at 31, 35.) Thinking Mr. Atchison had a gun and was going to shoot, Defendant fired a single shot that killed him. (Dkts. 60 at 122; 70 at 31–32, 36.)

Four years later, a Fulton County grand jury returned an indictment charging Defendant with involuntary manslaughter and violation of oath, for causing Mr. Atchison's death by recklessly "enter[ing]" Ms. Pless's apartment "in violation of the operation plan." (Dkt. 1 at 2.) The grand jury also returned a second indictment charging Defendant with felony murder, aggravated assault, and violation of oath, for "shooting at [Mr. Atchison] with a handgun." (Dkt. 1-1 at 2–3.) Defendant removed to this Court based on 28 U.S.C. § 1442, and the Court denied Georgia's motions to remand. (Dkts. 2; 27.) Defendant now moves to dismiss both indictments based on federal Supremacy Clause immunity and Georgia self-defense immunity. (Dkts. 8; 37.)

The Court held an evidentiary hearing late last year at which the parties elicited testimony from Georgia's use-of-force expert (Nicholas Bloomfield) and five of the officers involved in the operation to arrest

Mr. Atchison (Kelly Lambert, Matt Winn, Mark Cooper, Paul Costa, and Mason Mercure). (Dkts. 60; 61.) The Court admitted several exhibits at the hearing, including the grand jury testimony of another officer involved in the operation (Tim Turner). (Dkts. 52; 52-10; 53.) The parties then filed post-hearing briefs and other memoranda at the Court's request. (Dkts. 56; 58; 62; 63; 67; 69.) The Court also held a second evidentiary hearing at which Defendant testified. (Dkt. 70.) Having considered the parties' submissions and the record more generally, the Court grants Defendant's motion to dismiss.

## I.    Defendant's First Indictment

Defendant's first indictment charges him with involuntary manslaughter and violation of oath on the ground that he caused Mr. Atchison's death by recklessly entering Ms. Pless's apartment. (Dkt. 1 at 2.) Defendant argues he is entitled to Supremacy Clause immunity for these charges. (Dkt. 56 at 1–2, 4–6.) The Court agrees.

### A.    Legal Standard

Under the doctrine of Supremacy Clause immunity, a state cannot prosecute a federal officer if (1) the officer was "in the performance of an act which he [was] authorized by federal law to do as part of his duty,"

and (2) "what the officer did was no more than what was necessary and proper for him to do." *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982); *see Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009). A defendant meets the first prong if he was acting within "the general scope of [his federal] duties" at the time of his alleged offense. *Baucom*, 677 F.2d at 1350; *see Denson*, 574 F.3d at 1347 (defendant must "act[] within the outer perimeter of [his] line of duty as defined by federal . . . law"). He meets the second prong if he "reasonably believed" his charged conduct was "appropriate to carry out his federal duties." *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017); *Whitehead v. Senkowski*, 943 F.2d 230, 234 (2d Cir. 1991); *see New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) ("the actor must subjectively believe that his action is justified" and "that belief must be objectively reasonable"). Whether defendant reasonably held such a belief depends on "the circumstances as they appear[ed] to [him] at the time rather than the more subtle and detailed facts later presented to a court." *Kleinert*, 855 F.3d at 319; *see*

*Tanella*, 374 F.3d at 151 (assessing reasonableness "from [defendant's] viewpoint").[1]

A defendant may invoke Supremacy Clause immunity in a pre-trial motion to dismiss. *Com. of Ky. v. Long*, 837 F.2d 727, 750 (6th Cir. 1988); *Tanella*, 374 F.3d at 146. If he does, the court must grant the motion and dismiss the indictment unless the state establishes a genuine dispute of material fact. *Livingston*, 443 F.3d at 1226; *Tanella*, 374 F.3d at 148; *Long*, 837 F.2d at 752. In determining whether the state has met its burden, the court must "view the evidence in the light most favorable to the State." *Tanella*, 374 F.3d at 148, 151.[2]

---

[1] Some courts have questioned whether an officer need subjectively believe his actions were appropriate. *See Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006) ("[I]t may . . . be appropriate to reject a subjective element of the Supremacy Clause immunity test."); *Idaho v. Horiuchi*, 253 F.3d 359, 366 n.11 (9th Cir. 2001) (suggesting qualified immunity's rejection of a subjective prong "would seem to apply equally to supremacy clause immunity"), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001). For the purposes of this case only, the Court assumes a subjective belief is required because doing so is consistent with the weight of authority, both parties agree an "honest and reasonable belief" is required, and the issue does not affect the outcome of this Order. *See Livingston*, 443 F.3d at 1221 ("most circuit courts have adopted the subjective approach" to Supremacy Clause immunity); (Dkts. 56 at 6; 58 at 118; 65 at 2).

[2] Some judges have suggested the court—rather than a jury—may resolve disputed factual issues relevant to Supremacy Clause immunity. *See,*

**B.    Defendant's Entry into the Apartment**

The only specific misconduct alleged in Defendant's first indictment is his entry into Ms. Pless's apartment (which allegedly violated the operation plan and led to Mr. Atchison's death).  No one disputes that, when Defendant entered the apartment to pursue Mr. Atchison, he was "in the performance of an act which he [was] authorized by federal law to do as part of his duty."  *Baucom*, 677 F.2d at 1350.  So, for Supremacy Clause immunity to apply, Defendant need only show his entry was "necessary and proper."  *Id.*  Defendant has made that showing.

Defendant reasonably believed it was appropriate to enter Ms. Pless's apartment—and thus his entry was "necessary and proper"—because (1) the FBI Task Force had a leadership-approved operation plan to arrest Mr. Atchison on a warrant for armed robbery; (2) Defendant was a member of the Task Force team assigned to make the arrest; (3) Ms. Pless told the Task Force officers that Mr. Atchison was in her apartment; (4) Ms. Pless not only authorized the officers to enter her apartment but affirmatively asked them to do so; (5) every officer decided

---

*e.g., Horiuchi*, 253 F.3d at 374–76.  The Court declines to take that approach here because no one has asked it to do so.

entry was appropriate; (6) no officer expressed any hesitation about the entry; (7) the officers entered the apartment only after repeatedly and loudly ordering Mr. Atchison to come out; (8) the apartment door was unlocked; (9) other officers entered before Defendant; and, crucially, (10) officers testified their entry into Ms. Pless's apartment was consistent with "what [they] do . . . . [a]ll the time" (Dkt. 60 at 37). Indeed, at the evidentiary hearing, the officers could not have been clearer that pursuing "somebody hiding in an apartment" was simply business as usual and a routine "part of the[ir] job." (*See* Dkts. 60 at 37 (entering apartments to apprehend "somebody hiding [inside]" is "what we do . . . . [a]ll the time"), 73 ("searching for somebody who's fled on foot" and "conducting consent searches of . . . apartments," is "what we do . . . day in and day out"), 74 (Task Force routinely pursues subjects who have "run," "concealed themselves," or "been hiding"), 157 ("We trained for this and did this daily."), 204–205 (pursuing "armed" and "hidden" subjects— including those "hiding in an apartment"—is "part of the job"); 61 at 70 ("We were doing what we do all day every day.").)

Georgia argues, because Defendant never testified at the evidentiary hearing about his decision to enter the apartment, we cannot

know whether he subjectively believed entry was appropriate. (Dkt. 58 at 17–18.) The Court rejects this argument. Tim Turner testified "all" the officers—including Defendant—"decided [they] needed" to enter the apartment to "investigate" whether Mr. Atchison was inside. (Dkt. 52-10 at 10.) Paul Costa testified it did not appear "anyone"—including Defendant—"was hesitating" over whether to enter. (Dkt. 60 at 205.) Mason Mercure also testified he didn't hear "any" officer—including Defendant—question whether entry was appropriate. (Dkt. 61 at 59.) All of this suggests each officer—including Defendant—subjectively believed entering the apartment was necessary to carry out their assignment to apprehend Mr. Atchison. (*See* Dkt. 61 at 170 (Georgia's expert had "no reason to dispute" the officers "believed . . . they were acting appropriately when they went in").) That conclusion is particularly hard to resist when you consider the other evidence listed above, including the officers' testimony about the entry being consistent with what they do every day. Given the totality of the record, the Court readily concludes Defendant thought it was appropriate to enter the apartment. That Defendant never said this directly at the evidentiary hearing does not require a different result. *See United States v. Flores*,

945 F.3d 687, 712 (2d Cir. 2019) (though "direct evidence of a person's state of mind" is "seldom" available, "it is often possible to infer knowledge or belief from outward manifestations such as a defendant's statements or conduct, or from the circumstances surrounding or attendant upon facts he or she is alleged to have known.").

Georgia argues, even if Defendant did believe it was appropriate to enter Ms. Pless's apartment, his belief was unreasonable. (Dkt. 58 at 21–25.)  Georgia relies on Mr. Bloomfield's expert testimony for this assertion.  (Dkt. 58 at 23.)  But Mr. Bloomfield testified only about the officers collectively—not Defendant individually—when he criticized the decision to enter Ms. Pless's apartment.  (*See* Dkt. 61 at 105 (criticizing "the officers', plural, decision to enter the last apartment").)  Indeed, he seemed to concede that, because the rest of the officers decided entry was appropriate, it was "reasonable" for Defendant to "follow the group in and perform his role in [the] tactical entry."  (Dkt. 61 at 180; *see also* Dkt. 61 at 170.)

Further underscoring Mr. Bloomfield's focus on the officers collectively rather than Defendant specifically, Mr. Bloomfield also criticized the entry decision based on information of which there is no

11

evidence Defendant was aware.  For example, Mr. Bloomfield testified the entry decision was unwise because Ms. Pless told Kelly Lambert "she knew who Mr. Atchison was," and because Kelly Lambert and Mason Mercure heard Mr. Atchison say "you're going to have to kill me" earlier in the operation.  (*See* Dkts. 60 at 27–28; 61 at 16, 106–108, 152–253.)  Nothing suggests Defendant heard or was otherwise aware of these statements, meaning neither statement has any bearing on the reasonableness of his beliefs.  (*See* Dkts. 60 at 52 (Kelly Lambert didn't communicate Mr. Atchison's statement to anyone); 61 at 16–17 (Mason Mercure couldn't say whether Defendant heard Mr. Atchison's statement); *see also* Dkt. 60 at 33–34, 76, 154–155 (describing what Kelly Lambert relayed to other officers about his conversation with Ms. Pless).) That Mr. Bloomfield based his opinion on both statements—particularly Ms. Pless's statement—casts further doubt on the applicability of his opinion to Defendant.

Even if Mr. Bloomfield had directed his criticism at Defendant specifically, his testimony would still be unavailing.  Mr. Bloomfield testified the officers' entry decision was wrong only in the sense that it violated "generally accepted police practices" as established by "expert

bodies," "trade publications," "criminologists," and the like. (Dkt. 61 at 97–102, 105–106; *see* Dkt. 61 at 82 ("As an expert witness, I am retained to . . . evaluate the actions of the officers against generally accepted police practices."), 87 ("My role as an expert is to testify to whether or not the actions of the officer are consistent or inconsistent with generally accepted police practices."), 88 ("I am testifying to generally accepted police practices."), 97–98 ("I compare the actions of the officers up against generally accepted police practices and that's how I arrive at my opinions."), 105 ("I am speaking to it, again, strictly from generally accepted police practice."), 152 ("I base these answers off of the standards of generally accepted practice within the industry."), 185 ("I'm just testifying to generally accepted practices.").) But Mr. Bloomfield admitted "not all organizations" follow his "generally accepted" practices, each "organization[] obviously develop[s] [its] own polic[ies]," those policies "govern the actions of [its] officers," and he did not know the policies to which Defendant was subject in this case. (Dkt. 61 at 89–91, 131.) Given these concessions, the Court cannot say Defendant knew or should have known he was required to follow Mr. Bloomfield's "generally accepted" practices. Indeed, the record suggests the opposite because the

officers repeatedly testified their actions—many of which were contrary to Mr. Bloomfield's practices—were consistent with what they were taught to do and what they actually did all the time. If the officers were simply doing what they were always taught and permitted to do, it is hard to say they couldn't *reasonably* believe their actions were appropriate, even if outsiders might view the propriety of their actions differently.[3]

To take just one example of the conflict between Mr. Bloomfield's "generally accepted" practices and the officers' everyday training and experience, consider the issue of whether Mr. Atchison "barricaded" himself inside Ms. Pless's apartment. Mr. Bloomfield testified Mr. Atchison did barricade himself—and thus the officers should've stayed outside and summoned other resources—based on guidance from the International Association of the Chiefs of Police (an "expert body" that "provide[s] recommendations on a variety of topics in policing"). (Dkt. 61 at 98, 108–110, 146–147, 154–155.) But every officer who

---

[3] Of course, if an officer's actions are particularly extreme or egregious, his belief in the necessity of his conduct may well be unreasonable regardless of any prior training or experience. Defendant's actions fall well short of that threshold here, though.

testified said this was inconsistent with their training and practice. (*See* Dkts. 52-10 at 9; 60 at 36–40, 66, 76–77, 110, 157, 173–175, 203–204; 61 at 57–59, 74–75; *see also* Dkt. 61 at 150–151.)  Indeed, the officers' tone and demeanor suggested they found Mr. Bloomfield's opinion not only at odds with their experience but also genuinely puzzling because, in Mark Cooper's words, they "trained for [such entries] and did [them] daily." (Dkt. 60 at 157.)

Given the conflict between Mr. Bloomfield's recommended practices and Defendant's actual training and experience, Defendant reasonably followed the latter and entered the apartment.  Defendant's decision, even if wrong, was still "reasonable" within the meaning of the Supremacy Clause. *See Kleinert*, 855 F.3d at 319 (defendant reasonably believed his actions were appropriate, including because "[n]umerous law enforcement officers testified [he] acted consistently with his training and with what other officers would have done under the circumstances"); *Petition of McShane*, 235 F. Supp. 262, 269–70, 274–75 & n.8 (N.D. Miss. 1964) (no genuine dispute that an officer reasonably believed his conduct was appropriate even though other "experienced police officers" criticized his conduct on several grounds and characterized what he did as "wholly

unnecessary," "indiscriminate[]," "dangerous," and "reckless[]"); *see also Long*, 837 F.2d at 745 ("[A] mistake in judgment or a botched operation . . . will not of itself subject a federal agent to state court prosecution.").

### C.    Defendant's Conduct Inside the Apartment

Georgia argues the first indictment charges Defendant not only with recklessly entering Ms. Pless's apartment but also with acting recklessly *inside* the apartment.  Specifically, Georgia claims Defendant recklessly entered the room where Mr. Atchison was hiding and then recklessly engaged with Mr. Atchison upon finding him in the closet. (Dkts. 67 at 13–14; 69.)  But the indictment says literally nothing about what Defendant did after he entered the apartment.  It charges him only with "caus[ing] the death of Jimmy Atchison . . . by the commission of an unlawful act . . . , said unlawful act . . . being committed when [Defendant] entered [the apartment] in violation of the operation plan prepared for the January 22, 2019 effort to arrest Jimmy Atchison." (Dkt. 1 at 2.)  The Court declines to charge Defendant for conduct that is neither explicitly stated nor logically covered by the indictment itself. *See Eastman*, 911 S.E.2d 484, 486 (Ga. Ct. App. 2025) (indictment must

"sufficiently apprise[] the defendant of what he must be prepared to defend against").

Even assuming the indictment did charge Defendant with recklessly entering the room where Mr. Atchison was hiding and then engaging with him directly, Defendant would still be entitled to immunity under the Supremacy Clause.  No one disputes that, when Defendant took these actions, he was "in the performance of an act which he [was] authorized by federal law to do as part of his duty." *Baucom*, 677 F.2d at 1350.  And, as with the initial entry into the apartment, the Court concludes Defendant's actions inside the apartment were "necessary and proper."  *Id.*  Defendant reasonably believed it was appropriate to enter the bedroom and engage with Mr. Atchison, including because (1) the bedroom door was open (Dkt. 60 at 86); (2) Tim Turner instructed Defendant to enter the room (Dkt. 52-10 at 11– 13); (3) Defendant did not know Mr. Atchison was hiding in the closet until he entered the room (Dkts. 60 at 108, 137; 70 at 30); (4) the officers testified they routinely "walk[] into a room where a potential subject is concealed" and "arrest[] . . . people hiding under piles of clothing" (Dkts. 60 at 53, 89, 175, 184–185; 61 at 63–65, 74–75); (5) the officers testified,

once in the room, it was tactically appropriate for Defendant to face Mr. Atchison rather than try to withdraw (Dkts. 60 at 89–90, 109, 130–131, 135–137; 61 at 62, 119; 70 at 31); (6) Mr. Atchison did not comply with Defendant's commands when they faced one another in the room (Dkt. 60 at 169, 200); (7) the circumstances were "tense, uncertain, and rapidly evolving," and Defendant's "close-quarter" encounter with Mr. Atchison was "hardly conducive to detached deliberation," *Tanella*, 374 F.3d at 151–52; and (8) the reasonableness required for Supremacy Clause immunity is a forgiving standard that permits "a mistake in judgment" or even "a botched operation," *Long*, 837 F.2d at 745 (citing *McShane*); *see Tanella*, 374 F.3d at 147 (defendant "need not show that his action was in fact necessary or in retrospect justifiable").

Given the totality of the record, the Court dismisses the charges in Defendant's first indictment because there is no genuine dispute that he is immune to those charges under the Supremacy Clause.

## II.    Defendant's Second Indictment

Defendant's second indictment charges him with felony murder, aggravated assault, and violation of oath, for "shooting at [Mr. Atchison] with a handgun." (Dkt. 1-1 at 2–3.) Defendant argues he is entitled to

18

self-defense immunity for these charges.  (Dkt. 56 at 1–4.)  The Court agrees.

## A.    Legal Standard

Under Georgia law, a defendant is "immune from criminal prosecution" for "using force which is intended or likely to cause death or great bodily harm" if he "reasonably believes that such force is necessary to prevent death or great bodily harm to himself . . . or a third person." O.C.G.A. §§ 16-3-21(a), 16-3-24.2; *Reddick v. State*, 911 S.E.2d 638, 645 (Ga. 2025); *State v. Copeland*, 850 S.E.2d 736, 742 (Ga. 2020).  To invoke this immunity, defendant must show (1) he used force intended or likely to cause death or great bodily harm, (2) he "actually believed" such force was necessary to prevent death or great bodily harm to himself or another, and (3) his belief was "objectively reasonable." *Allen v. State*, 890 S.E.2d 700, 706 (Ga. 2023).  Defendant bears the burden to establish these elements before trial by a preponderance of the evidence. *Hughes v. State*, 861 S.E.2d 94, 101 (Ga. 2021).  Whether a defendant has met this burden is for the court—not a jury—to determine based on its own assessment of the record. *Hipp v. State*, 746 S.E.2d 95, 98 (Ga. 2013); *Griffin v. State*, 904 S.E.2d 100, 102 (Ga. Ct. App. 2024).  The court may

hold an evidentiary hearing and "make credibility determinations and factual findings based on all of the evidence before it." *State v. Hamilton*, 839 S.E.2d 560, 572 (Ga. 2020).

"Law enforcement officers may seek [self-defense] immunity . . . when they are indicted based on their . . . use of force." *Copeland*, 850 S.E.2d at 743. "When they do, their evidentiary burden is identical to that of any other defendant." *Id.* Indeed, "the law of self-defense is the same for a police officer as it is for any other citizen." *Olsen v. State*, 899 S.E.2d 518, 522 (Ga. Ct. App. 2024).

## B.   Analysis

Defendant is clearly entitled to self-defense immunity under the above standards. He shot Mr. Atchison in the cheek with a gun, which was "likely to cause"—and did cause—Mr. Atchison's "death." O.C.G.A. § 16-3-21(a). He testified he did so when Mr. Atchison suddenly moved his hand because "in that split second" he believed Mr. Atchison was going to shoot and kill him (meaning Defendant "actually believed" his use of force was "necessary to prevent [his own] death"). *Id.*; *Allen*, 890 S.E.2d at 706; (Dkt. 70 at 31–32, 36). This belief was "reasonable" because (1) Mr. Atchison was wanted for armed robbery with a handgun

(Dkt. 52-7 at 1); (2) the operation plan stated he was previously arrested for armed robbery and aggravated assault on a law enforcement officer (Dkt. 52-7 at 2); (3) Mr. Atchison had already taken extreme measures to avoid arrest, including jumping out of a second- or third-story apartment window, repeatedly running from the officers, and hiding in the residence of someone who didn't want him there (Dkt. 60 at 28–29, 63); (4) Defendant was fully exposed and just feet away from Mr. Atchison during their encounter (Dkts. 60 at 92, 105; 70 at 32, 34); (5) Mr. Atchison moved his right hand out of a concealed position "very abrupt[ly] and "very quickly," "pointing [it] right at [Defendant's] chest/face area" (Dkts. 60 at 91, 169–171; 70 at 30–31);[4] (6) everyone who witnessed the hand movement (Defendant, Matt Winn, Paul Costa, and Mark Cooper) testified they thought Mr. Atchison was trying to shoot Defendant;[5]

---

[4] Paul Costa testified he saw "at least one hand" emerge from the clothes but "believed it to be two hands kind of clamped together . . . . as if grasping a gun." (Dkt. 60 at 211–215.) Everyone else testified they saw only one hand. Whether Mr. Atchison raised one hand or both hands is immaterial. The Court concludes, however, that he raised only his right hand because that is what the weight of the evidence suggests.

[5] (*See, e.g.*, Dkts. 60 at 96 ("I believed he was raising a gun."), 121 ("I believed [Mr. Atchison] was raising a gun to shoot us" including because he "raise[d] his right hand . . . extremely fast with a closed fist pointed at Sung Kim"), 122 ("I reached the conclusion that he was

(7) witnesses testified Mr. Atchison's hand movement was inconsistent with an attempt to surrender or comply (Dkt. 60 at 96–97, 170–171, 212–213, 215; *see also* Dkt. 61 at 68); and (8) Georgia's own expert testified Mr. Atchison's hand movement was "a deadly force stimulus," "a reasonable officer" would have construed it that way, and he did "not criticiz[e] Officer Kim for responding" as he did (Dkt. 61 at 103, 122, 142, 168).[6]

Georgia counters that none of the other officers in the room shot Mr. Atchison when he moved his hand. (Dkt. 58 at 28.) But Defendant was the one giving commands to Mr. Atchison, he stood closest to Mr. Atchison, he faced Mr. Atchison most directly, and Mr. Atchison pointed his hand at *him*. (Dkts. 60 at 91–92; 70 at 31, 34.) So it is

---

attempting to apply deadly force to us when his hand came up."), 170 ("It was a very quick, rapid movement, which . . . gives the appearance that the individual's coming up with a gun."), 213–215 (Mr. Atchison moved his hands in "a threatening motion" as if "grasping" and "pointing" a "gun"), 221–222 ("I was concerned that there was a firearm in that split second."); 70 at 31 ("I see his right arm raise very fast under the clothes, pointing right at my chest/face area" as if he were "holding a firearm," and, in "that split second, I thought he was going to shoot me"), 32 ("[W]hen I discharged my firearm, I'm thinking, well, that guy's trying to shoot me."), 36 ("[W]hen he raised his arm up under the clothes, I thought he had a gun and was going to shoot me.").)

[6] These facts also support Defendant's testimony that he "actually believed" deadly force was necessary. *Allen*, 890 S.E.2d at 706.

unsurprising that Defendant responded faster than the others.  Indeed, one officer testified he "would . . . have felt comfortable shooting" but Defendant simply beat him to it.  (Dkt. 60 at 96, 120.)

Georgia also claims "no [one] could be certain it was Atchison under the clothes."  (Dkt. 58 at 28.)  But self-defense does not require certainty; reasonableness is the standard.  *See* O.C.G.A. § 16-3-21(a).  To the extent the officers believed it was Mr. Atchison under the clothes, that belief was reasonable because Ms. Pless told them he was in the apartment, they already cleared the other rooms (or all but one of those rooms), and hiding and ignoring commands was consistent with Mr. Atchison's earlier efforts to evade arrest.  Besides, it doesn't really matter who sat under the clothes because, given the context, whoever it was presented "a deadly force stimulus" based on their sudden and rapid movement towards Defendant from a concealed position just feet away.

Georgia next argues, although Mr. Atchison "motion[ed] as if he had a gun," no one actually saw a gun in his hand.  (Dkt. 58 at 28.)  This argument falls well short.  Nothing required Defendant to hold off on shooting until he literally saw a gun in Mr. Atchison's hand.  He had a

reasonable belief Mr. Atchison was armed and was going to shoot him. That is all that matters.

Finally, Georgia argues "a question remains as to whether Defendant accidentally shot Atchison." (Dkt. 58 at 28.) Not so. Defendant affirmatively testified he didn't "fire [his weapon] on accident." (Dkt. 70 at 31.) No one testified to the contrary. True, Mason Mercure thought Defendant looked "surprise[d]" when he fired. (Dkt. 61 at 66.) But Defendant testified he was surprised only that Mr. Atchison "would do something like that"—make such a sudden and rapid movement in his direction—given how "close" they were to one another. (Dkt. 70 at 32.) In other words, Defendant was surprised he "*needed* to fire [his] weapon," not that he actually did so. (Dkt. 70 at 32 (emphasis added).)

Given the totality of the record, the Court readily concludes Defendant is entitled to self-defense immunity under O.C.G.A. § 16-3-24.2 for the charges asserted in the second indictment. The record permits no other conclusion. Indeed, the evidence for self-defense is so overwhelming it is hard to understand how Georgia could have brought these charges in the first place, much less continued with them over the

two and a half years since. Defendant's shooting of Mr. Atchison was textbook self-defense. The indictment charging him for that shooting is thus dismissed.[7]

## III. Conclusion

The Court **GRANTS** Defendant's Motion to Dismiss (Dkts. 8; 36), **DISMISSES** the first indictment (Dkt. 1) as barred by Supremacy Clause immunity, and **DISMISSES** the second indictment (Dkt. 1-1) as barred by self-defense immunity.[8]

**SO ORDERED** this 3rd day of June, 2025.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

[7] In a sur-reply brief, Georgia claims Defendant is not entitled to self-defense immunity because he "created the conditions and acted in such a manner that led to [his] violent confrontation with [Mr. Atchison]." (Dkt. 63 at 4.) Georgia does not elaborate on this one-sentence assertion, cites no supporting authority (beyond a case that simply says excessive force precludes self-defense), and never raised the issue in its earlier briefing (Dkts. 38; 58). Even assuming the argument were properly presented, the Court would reject it because nothing suggests Georgia courts have applied—or would apply—a theory of "officer-created jeopardy" to self-defense immunity on the facts here. (Dkt. 70 at 39.)

[8] Given these conclusions, the Court need not decide whether Defendant also has self-defense immunity for the first indictment or Supremacy Clause immunity for the second indictment.